UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

                              Plaintiff,                    REPORT & RECOMMENDATION

                                                           5:20-CR-0243(FPG/MWP)

             v.

DENNIS NELSON,

                              Defendant.

_____

## PRELIMINARY STATEMENT

On July 30, 2021, this Court granted the motion filed by counsel for the defendant

Dennis Nelson[1] pursuant to 18 U.S.C. § 4241 and ordered the defendant to undergo a psychiatric

or psychological examination to determine whether she is currently suffering from a mental

disease or defect rendering her mentally incompetent to understand the nature and consequences

of the proceedings against her or to assist properly in her defense.[2]  (Docket # 27).  Nelson was

evaluated from September through November 2021 by Miriam Kissin, Psy.D., a forensic

psychologist at the Federal Medical Center in Devens, Massachusetts.  (Docket ## 44; 49 at 66).

On March 28, 2022, this Court received Dr. Kissin's report diagnosing Nelson with mixed

personality disorder with antisocial and borderline traits (noted as "primary diagnos[i]s") and

---

[1]  The defendant is transgender, and this Court will use female pronouns to refer to her, as her attorney and the forensic psychologist did during the competency hearing.

[2]  At counsel's request, the Court also ordered that the defendant be examined to determine her sanity or insanity at the time of the charged offenses, pursuant to 18 U.S.C. § 4242(a).  (Docket # 27).  The results of that examination are not at issue at this time.

borderline intellectual functioning (noted as "secondary diagnos[i]s") and opining that she is currently competent to stand trial.  (Docket # 44 at 7-11).

This Court held a competency hearing on May 5, 2022, at which time Dr. Kissin testified.  (Docket # 49).[3]  Consistent with her report, Dr. Kissin testified that Nelson is currently competent to proceed.  (Tr. 5-6, 88-89).  Following the hearing, on August 1, 2022, the defense submitted a post-hearing submission urging the Court to reject Dr. Kissin's opinion and find the defendant incompetent to stand trial.  (Docket # 50).  The government submitted a one-paragraph letter "refer[ring] the Court" to Dr. Kissin's report and testimony "reflect[ing] [her] conclusion that defendant does not evidence psychiatric illness or cognitive defects which serve to undermine her competency-related capacities."  (Docket # 51).


**BACKGROUND**

A.    **Dr. Kissin's Experience**

Dr. Kissin testified that she has been employed as a forensic psychologist by the Federal Bureau of Prisons for the past thirteen years.  (Tr. 3).  During that time she has worked at the Federal Medical Center, Devens ("Devens"), which is where she evaluated Nelson during the period September through November 2021.  (Tr. 3; Docket # 44).

B.    **Nelson's Medical and Mental Health History**

In preparing her report and rendering her opinions concerning Nelson's diagnosis and competence, Dr. Kissin reviewed, among other materials, medical records from the New York State Office of Mental Health, the New York State Department of Corrections, and the

---

[3]  The transcript of the competency hearing shall be referred to herein as "Tr."

Federal Bureau of Prisons documenting Nelson's lengthy and involved history of mental health illness, for which she has received psychiatric care throughout her life. (Docket # 44 at 2; Tr. 8-9). Although Dr. Kissin noted that Nelson's own account of her history and mental health issues was "variably consistent" with the records reviewed by Dr. Kissin (Docket # 44 at 2), those discrepancies do not undermine the fact that Nelson's mental health issues and behavioral problems have persisted for decades, from Nelson's early teens through the present time (Nelson is currently 51). (Docket # 44 at 1-5; Tr. 9). She was unable to complete her education as a result of those issues, reporting to Dr. Kissin that she had been expelled from school after fifth grade due to anger issues. (Docket # 44 at 3; Tr. 10). For the vast majority of her life, she has resided in psychiatric treatment centers or prisons. (Tr. 10; Docket # 44 at 3-4, 6). As a teen, for example, she was placed at the Hillside Children's Center and Hutchins Psychiatric Center and has been incarcerated for her entire adult life. (Docket # 44 at 3-4, 6). While incarcerated, she has been repeatedly sanctioned for disciplinary infractions. (*Id.* at 4).

Nelson suffers from a variety of medical issues. (*Id.*). Among other things, she is diagnosed with Klinfelter's Syndrome, which Dr. Kissin described as "a genetic disorder characterized by an extra X chromosome, manifesting in hormonal changes resulting in feminized appearance, developmental disorders, and emotional and behavioral disturbances." (*Id.*). She suffers from asthma, seizures, and hip and leg problems that impair her mobility. (*Id.*). According to a presentence report prepared in 2007, Nelson has an "underdeveloped left-brain hemisphere." (*Id.*). Dr. Kissin's report further notes that in 2018 Nelson was diagnosed with "Anemia and Factor V Mutation," requiring frequent hospital admissions and weekly blood transfusions. (*Id.* at 4, 6).

As far as her mental health history, Dr. Kissin's report indicates that Nelson's psychological reports reflect a consistent primary diagnosis of antisocial personality disorder, the problematic behavioral symptoms of which have historically exhibited little change upon treatment with antipsychotics and mood stabilizers. (*Id.* at 5). As Dr. Kissin noted, Nelson had already been designated to Devens before the competency evaluation commenced "in light of her need for psychiatric treatment." (*Id.* at 1, 4). Upon her arrival at Devens in December 2020, Nelson was diagnosed with delusional disorder, among other conditions, and has been treated with Geodon, an antipsychotic.[4] (Docket # 44 at 5; Tr. 15-16, 20-21). At one time or another in her life, Nelson has also been diagnosed with: dysthymic disorder, gender dysphoria, intermittent explosive disorder, and persistent depressive disorder. (Docket # 44 at 5). Her mental health treatment has included psychotropic medication, emergency department treatment, and numerous hospitalizations. (Tr. 16). Past cognitive testing reflects that Nelson's intellectual functioning falls within the "Borderline" range. (Docket # 44 at 4-5; Tr. 11-12, 60, 66).

Dr. Kissin's report also notes that Nelson has a significant history of "self-injurious behaviors, including cutting, biting herself, and inserting objects into her body." (Docket # 44 at 5; Tr. 50-51). While at Devens, in August 2021, Nelson cut her neck with a razor and was placed on suicide watch. (Docket # 44 at 5; Tr. 40). Nelson explained to Kissin that she cut herself because she believed staff were "playing games" with her by placing her on Covid-19 quarantine, but acknowledged in retrospect that she may have "misinterpreted" the action. (Docket # 44 at 5; Tr. 40).

---

[4] Dr. Kissin testified that she was unsure whether Nelson's diagnosis upon arrival at Devens was based upon her mental health history or an intake evaluation of her by the psychiatrist. (Tr. 15).

C.    <u>**Nelson's Behavior at Devens**</u>

Dr. Kissin's report states that following Nelson's removal from suicide watch, she remained stable and exhibited no "behavioral disturbances, or instances of aggression or self-harm." (Docket # 44 at 5). Although she complained during the evaluation of being "picked on" by her cellmate and other individuals on her open mental health unit, no "significant interpersonal conflicts" were observed. (*Id.* at 5-6). Dr. Kissin did note that Nelson was sanctioned in January 2022 for making a false claim of "sexual harassment/threat." (*Id.* at 6).

D.    <u>**Dr. Kissin's Evaluation and Diagnoses**</u>

During the three-month psychological evaluation of Nelson, Kissin observed the following:

> [Ms. Nelson] was consistently adequately groomed. Throughout the evaluation, Ms. Nelson was alert, and made adequate eye contact. She was cooperative and forthcoming with all interviews. Her observed affect was generally neutral. She described her mood as 'much friendlier,' since being prescribed Geodon. She denied feeling depressed or anxious, and explicitly denied any suicidal or homicidal ideation or intent. She was oriented to her circumstances and surroundings. Her speech was not marked by any notable hesitations or delays in fluidity, and her communications were consistent. Ms. Nelson's recent and remote memory appeared intact. She did not endorse any hallucinations, nor did she at any point in the evaluation appear to be attending to any internal stimuli. Further, she did not make any statements which could be considered delusional in nature. Ms. Nelson's cognitive functioning appeared consistent with previously reported scores in the Borderline range.

(*Id.*).

As noted above, Dr. Kissin diagnosed Nelson with mixed personality disorder with antisocial and borderline traits. (Docket # 44 at 7; Tr. 4). With respect to that diagnosis, and the antisocial traits in particular, Dr. Kissin summarized:

> Ms. Nelson has a long-standing history of acting out behaviors and psychiatric involvement. Her history, including early conduct problems progressing to criminal acts indicates difficulty conforming her behavior to societal norms and laws. Ms. Nelson has spent the entirety of her adult life in custody. Even while incarcerated, she continued to engage in rule-breaking behaviors, resulting in disciplinary sanctions and further criminal charges and penalties. Further, Ms. Nelson has engaged in repeated threatening behaviors towards others, which she has acknowledged she pursued in service of furthering her own interests. Such behavior connotes both a notable disregard for the safety and well-being of others, as well as a willingness to con others for her benefit. Her manner of characterizing past problematic behaviors during the present interviews was glib and devoid of remorse. In light of the long-standing pattern of these behaviors, they appear to be characterological in nature, rather than a response to specific environmental factors. Ms. Nelson has been consistently diagnosed with Antisocial Personality Disorder, and she continues to meet criteria for key elements of that diagnosis.

(Docket # 44 at 6).

With respect to the borderline traits of Nelson's diagnosed personality disorder,

Dr. Kissin summarized:

> She has an extensive history of difficulty tolerating and regulating anger and distress, without resorting to extreme reactivity. She often utilizes impulsive and self-destructive strategies to manage extreme emotions, such as self-harm. . . . Ms. Nelson is described to exhibit a long-standing pattern of interpersonal difficulties at numerous facilities with peers and staff, including using threats or self-harming behaviors [to] manipulate people and situations. . . . Ms. Nelson has been previously diagnosed with Borderline Personality Disorder, and continues to meet criteria for key elements of that diagnosis.

(*Id.* at 7). In her hearing testimony, Dr. Kissin explained that Nelson's self-harming behaviors often represent maladaptive and dramatic expressions of distress or attempts to get needs met and "are very consistent with borderline personality disorder." (Tr. 52-53).

6

Dr. Kissin also diagnosed Nelson with borderline intellectual functioning, noting that the diagnosis was supported by previous cognitive testing and Dr. Kissin's own observations of Nelson's presentation during their meetings. (Docket # 44 at 7; Tr. 4). In Dr. Kissin's estimation, Nelson "manifests a notable lack of intellectual sophistication, which at times undermines her effective decision-making." (Docket # 44 at 7).

Although Nelson has been diagnosed by others with schizophrenia and delusional disorder, Dr. Kissin did not find that Nelson currently suffers from those mental health disorders and observed that psychotic symptoms do not appear to have been a "consistent or dominant presence in her mental health history." (Docket # 44 at 7; Tr. 25, 26, 55). As to delusional disorder, Dr. Kissin explained that Nelson's documented "grandiose and false claims about herself" did not "drive[]" her behavior but appear "to have been expressed in the context of maladaptive interpersonal/relational skills, apparently with the intent to provoke and/or impress the listener" and are thus consistent with traits of borderline personality disorder. (Docket # 44 at 7). Dr. Kissin testified that Nelson's false and grandiose statements did not appear to reflect fixed false beliefs, noting that Nelson made them inconsistently and often later retracted them. (Tr. 25). As to schizophrenia, Dr. Kissin noted that Nelson's past reports of hallucinations were vague and unaccompanied by "consistent behavioral or adjustment deficits" and that Nelson did not endorse experiencing hallucinations in the course of the several-month competency evaluation. (Docket # 44 at 7).

E.    **Dr. Kissin's Assessment of Nelson's Ability to Understand the Nature of the Charges and Consequences of the Proceedings**

In terms of Nelson's ability to understand the nature and consequences of the criminal proceedings, Dr. Kissin observed generally that Nelson was "consistently able to

effectively process the information presented to her" and "provid[ed] meaningful and typically accurate responses to questions posed to her." (*Id.* at 8). More specifically, Nelson stated accurately that she is charged with six felony counts of making threats by mail to bomb and kill Congressman Anthony Brindisi, Senator Charles Schumer, and Senior United States District Judge Thomas McAvoy. (*Id.*). She conveyed that the penalties include incarceration and recounted that one count carries a ten-year possible sentence. (*Id.*). (Indeed, all counts carry ten-year maximum penalties). Dr. Kissin asked her about the types of verdicts that could be rendered and, as her report details, Nelson generally described accurately the meanings of and differences among verdicts of guilty, not guilty, and not guilty by reason of insanity. (*Id.*). Nelson's answers also demonstrated that she understood the differences in the consequences of those verdicts. (*Id.*).

    Upon questioning, Nelson's answers revealed that she had an accurate basic understanding of the roles of defense attorney, prosecutor, judge, and jury. (*Id.*). With respect to her attorney, she initially reported that counsel had been hired by her mother "but acquiesced when advised [counsel] is in fact a Federal Defender." (*Id.*). Dr. Kissin noted that Nelson initially thought a jury comprised eighteen members (apparently because she was including six alternates) but was corrected, and was not aware of the requirement of jury unanimity "but expressed understanding of the concept once it was explained." (Docket # 44 at 8-9; Tr. 75). When questioned about witnesses and evidence, Nelson articulated her understanding that witnesses and evidence could be presented by both sides and that witnesses are required to tell the truth. (Docket # 44 at 9). Although she could not define the term "perjury," she stated that a witness could be arrested for lying while testifying. (*Id.*).

8

**F.**     <u>**Dr. Kissin's Assessment of Nelson's Ability to Assist Properly in Her Defense**</u>

In terms of Nelson's ability to work with her counsel, assist properly in her defense, and make decisions that a defendant would be required to make, Dr. Kissin observed generally that Nelson was consistently willing to meet with her for competency evaluation interviews, although Nelson did cut short one interview, indicating that she could not "do this." (Docket # 44 at 8; Tr. 66-67). She appeared for the next scheduled interview, apologized for her behavior at the last meeting, explained that she had not been feeling well, "and exhibited no further difficulty completing the interview sessions." (Docket # 44 at 8). In Dr. Kissin's estimation, Nelson "appeared to put forth adequate effort when answering questions." (*Id.*).

With respect to Nelson's relationship with defense counsel in particular, the report noted that Nelson expressed distrust of her attorney and complained that she is ineffective (*Id.* at 9). Specifically, Dr. Kissin noted that Nelson complained that her counsel does nothing, "just collects [her] medical and mental health records and sends [her] paperwork," only talks to her about her mother, and needs to find out more about the actual charges. (*Id.*). Nelson conveyed her intention to request another attorney, but indicated that she would continue to work with current counsel if the request were denied. (*Id.*). Nelson understood that her lawyer has the responsibility to speak for her in court and that she would be required to act appropriately in court. (*Id.*). She expressed her belief that she would be able to remain claim, noting that her medication assists her in that respect. (*Id.*).

Nelson was familiar with the right not to testify, although she had difficulty articulating the underlying principle of protection against self-incrimination. (*Id.*). She expressed frustration when asked how a defendant would decide whether to accept a plea agreement or proceed to trial. (*Id.*). She eventually indicated that a defendant must "understand

what they're saying, the charges" and that a plea agreement would result in a lesser sentence than

if found guilty at trial.  (*Id.*).  Dr. Kissin testified that Nelson's difficulties in discussing the

decision-making process appeared to stem from her trouble with abstract concepts:

> She didn't understand what I was getting at and what I wanted her
> to – what the question was with what information I was trying to
> get her to answer in terms of her accepting what would happen if
> one went to trial verses accepting a plea and what might be the
> benefits and pitfalls of doing those two things.  I would not
> conceptualize that she didn't understand them.  I think she had a
> hard time answering those things in the abstract and I needed to
> conceptualize them in a few different ways to get at her responses.
> Her response was ultimately correct, so I do believe that she
> understand[s] the concept, but she's someone [who] has a hard
> time answering things in the abstract or not personalizing them,
> and that may certainly be driven by lack of sophistication.

(Tr. 83-84).  Dr. Kissin's report summarized Nelson's articulated thoughts about proceeding to

trial, the evidence she would face, and various lines of defense.  (Docket # 44 at 10).  The

statements did not appear to evidence irrational thought processes.  (*Id.*).

> **G.**     **Dr. Kissin's Opinion Regarding Nelson's Competence**

Based upon her evaluation, Dr. Kissin opines that Nelson does not currently have

a serious mental illness or defect "undermining her competency-related skills[;] she is able to

understand the nature and consequences of the proceedings against her and assist properly in her

defense."  (*Id.* at 11).  Dr. Kissin further opines that Nelson does not currently exhibit "acute

psychiatric symptoms or cognitive deficits which would serve as a limiting factor on her present

or future competency abilities."  (*Id.*).

In her report, Dr. Kissin summarized the bases for her competency opinion as

follows:

> Ms. Nelson has received psychiatric care for the majority of her
> life, often in response to a variety of problematic behaviors.

However, the nature of her behaviors appears to be primarily driven by characterological factors, rather than stemming from a severe psychiatric illness. Her reactivity in the context of situational stress, aggressivity, non-compliance, proclivity toward self-harming acts, and tendency toward manipulative behaviors are best explained by a combination of traits associated with Antisocial and Borderline Personality Disorders. Present treatment with an antipsychotic medication appears to serve as a calming agent, and has notably decreased the frequency and severity of Ms. Nelson's behavioral and adjustment problems. She does not currently present with any noted mood, anxiety, or psychotic symptoms, and there is no information suggesting she presently suffers from any such disorder. Ms. Nelson's cognitive functioning is documented as being limited, manifesting in a somewhat concrete and unsophisticated manner of processing information and communicating. However, she does not present with intellectual disability, such that significantly undermines her capacity for adaptive social and interpersonal functioning.

In regard to her competence-related abilities, Ms. Nelson was able to demonstrate an understanding of her charges and the possible consequences. She was able to coherently describe the facts of the charges against her and define a variety of relevant legal concepts, including elements of a trial, courtroom personnel, and types of pleas and verdicts. She also demonstrated an understanding of the adversarial nature of the legal process, identifying the goals and mechanisms used to achieve them by each side. Ms. Nelson was further able to apply these concepts to her own case, identifying potential defense strategies, witnesses, and evidence. While the legal viability of the strategies she described may certainly be questionable, there was no indication they are predicated on a delusional or otherwise disordered thought process associated with mental illness. Further, Ms. Nelson identified the factors she would consider when making decisions related to plea bargaining and testifying, suggesting capacity for rational decision-making. She also described appreciation of appropriate courtroom behavior. While Ms. Nelson expressed dissatisfaction with her attorney, there is no indication her concerns are driven by psychiatric symptoms. Furthermore, she endorsed willingness to work with an attorney toward the resolution of her legal case, to include [current counsel], should her request for a change of counsel be denied. Additionally, Ms. Nelson was able to provide a coherently personal history narrative, and communicate clearly across

11

multiple interviews, indicating she would likely be able to provide meaningful testimony if warranted.

(*Id.* at 10).

In her testimony, Dr. Kissin offered additional explanation for her opinion that

Nelson's personality disorder does not render her incompetent:

> [P]ersonality disorders are not something that you would treat with medication typically, although some aspects of them could be treated.  Some of the impulsivity and some of the mood components of borderline personality disorder would respond to medication, which is why antipsychotics could actually be very helpful because [the medication] kind of tones down some of that reactivity.  But these individuals are not unrooted in reality, they are not driven by delusions, not driven by auditory/visual hallucinations, not driven by mood symptoms such as mania. Those are the kind of things that when in the throes of those, competency can be compromised.  These are really more skill-based problems and the treatment for them is really providing individuals better skills to interact with other people and their environment . . .  Borderline personality disorder is probably one of the more severe personality disorders because it comes with often behaviors that are really problematic, and mood symptoms as well, and they could be overwhelming to individuals around them. But it's not treated in the same way that you would with a mental illness. . . .  The issue with competency is also the capacity is compromised but it's not undermined, it's not an issue of not having the capacity.  These individuals' behavior sometimes interferes with their . . . capacity that they [otherwise] have when they're not behaving in those ways.

(Tr. 89-91).


## DISCUSSION

A court must declare a criminal defendant incompetent to stand trial if it finds "by

a preponderance of the evidence that the defendant is presently suffering from a mental disease

or defect rendering [her] mentally incompetent to the extent that [she] is unable to understand the

12

nature and consequences of the proceedings against [her] or to assist properly in [her] defense."

18 U.S.C. § 4241(d).  The determination of competency turns on whether the defendant has

"(1) sufficient present ability to consult with [her] lawyer with a reasonable degree of rational

understanding and (2) a rational as well as factual understanding of the proceedings against

[her]."  *United States v. Nichols*, 56 F.3d 403, 410 (2d Cir. 1995) (internal quotations omitted)

(citing *Dusky v. United States*, 362 U.S. 402, 402 (1960) (*per curiam*)).  In assessing

competency, the district court "must weigh evidence and apply evidentiary standards," *United*

*States v. Brennan*, 928 F.3d 210, 216 (2d Cir. 2019), and "may rely on a number of factors,

including medical opinion and the court's observations of the defendant's comportment," *United*

*States v. Nichols*, 56 F.3d at 411 (citing *United States v. Hemsi*, 901 F.2d 293, 295 (2d Cir.

1990)).

   The question of which party bears the burden of proof with respect to competency

remains unsettled.  *See United States v. Marmolejos*, 2019 WL 2191139, *1 n.1 (S.D.N.Y. 2019).

Because this case is not one of the rare cases in which the evidence "is in equipoise," *Nichols*, 56

F.3d at 410 (internal quotation omitted), the Court does not need to resolve that question.  *United*

*States v. Marmolejos*, 2019 WL 2191139 at *1 n.1.

   As an initial matter, I find Dr. Kissin's testimony credible and her opinions

well-supported.  She is an experienced forensic psychologist whose testimony exhibited her

familiarity with and understanding of the differences between and among various different

mental health diseases and disorders, some of which may present with similar symptomology

and be treated with similar types of medication.  In addition, the reliability of her opinions is

further enhanced by the lengthy period of her examination – nearly three months – during which

time she met with Nelson multiple times and staff observed Nelson's behavior on the open mental health unit.

I credit Dr. Kissin's diagnosis that Nelson currently suffers from mixed personality disorder with antisocial and borderline traits. As Dr. Kissin explained in her report and in her hearing testimony, Nelson's persistent psychiatric history, which has resulted in periods of institutionalization, hospitalization, and ongoing treatment with medication including antipsychotics and mood stabilizers, has been marked by a longstanding pattern of antisocial behavior characterized by "acting out," "rule-breaking," and "self-harming" behaviors. (*See* Docket # 44 at 6-7). Those behaviors likely have been attempts to manipulate individuals or situations to her advantage or to manage extreme emotions. (*Id.*). As Dr. Kissin further elucidated, Nelson's "reactivity in the context of situational stress, aggressivity, non-compliance, proclivity toward self-harming acts, and tendency toward manipulative behaviors are best explained by a combination of traits associated with Antisocial and Borderline Personality Disorders." (*Id.* at 10). Dr. Kissin indicated that Nelson's prescribed antipsychotic medication has served "as a calming agent," decreasing both the frequency and severity of those behaviors. (*Id.*). She testified that antipsychotics, in addition to treating psychotic symptoms, "often [also] alter[] behavioral disturbances." (Tr. 20-21).

I further credit Dr. Kissin's opinion that Nelson also suffers from borderline intellectual functioning. That opinion is based upon previous cognitive testing that, although dated, is not subject to change over time, according to Dr. Kissin (Tr. 66), Dr. Kissin's observations of Nelson's ability to process information and communicate (Docket # 44 at 10), and her assessment of Nelson's adaptive functioning ability in "the setting that she's in," which Dr. Kissin found to be "very consistent[] with someone in the borderline range" (Tr. 62, 63).

14

Defense counsel challenges Dr. Kissin's conclusion as an overstatement of Nelson's intellectual capacities and contends that she should be found to suffer from an "intellectual disability." (Docket # 50 at 10).  On this point, the defense contends simply that "Nelson's limited functioning in communication and social participation is illustrated by her history of maladaptation in different environments."  (*Id.*).  In the absence of more specificity linking the maladaptive behaviors to intellectual functioning, I find that the record evidence supports Dr. Kissin's expert opinion that Nelson's intellectual functioning is "borderline" but not disabled.

        Based upon Dr. Kissin's conclusion from review of Nelson's mental health history that psychotic symptoms do not appear to have been "a consistent or dominant presence" in Nelson's past symptomology, and the absence of current reports by Nelson or Dr. Kissin's own observations in the course of her evaluation of psychotic, delusional or hallucinatory symptoms, she also opines that Nelson does not currently suffer from delusional disorder or schizophrenia.  The defense disputes that conclusion.  (*Id.* at 8-9) ("It is undisputed that Nelson suffers from a mental disease or defect[;] [t]he only dispute is about which one").  The defense challenges the absence of a delusional disorder diagnosis in view of the many false and grandiose statements Nelson has made in many different settings.  (*Id.*).  The defense contends that Dr. Kissin "testif[ied] about the many apparently delusional behaviors in which Ms. Nelson engages."  (*Id.* at 8).  The defense mischaracterizes Dr. Kissin's testimony.  As Dr. Kissin explained, the fact that an individual makes such statements does not alone demonstrate that she is delusional.  (Tr. 25, 42-43, 47).  Rather, the key determinant is whether those false statements stem from a fixed false belief, rather than from some other motivation, such as to provoke, manipulate or terrorize.  (Tr. 42-43, 47, 54).  In this respect, Dr. Kissin acknowledged that although she could not be sure that Nelson had not at some time in her past suffered from

delusional disorder, she is of the opinion that Nelson is not currently suffering delusional disorder. (Tr. 55). I credit that opinion.

In short, I find well-supported Dr. Kissin's opinions that Nelson suffers from the conditions she diagnosed. Dr. Kissin acknowledged that personality disorders are recognized and diagnosable mental health disorders according to the DSM (Diagnostic and Statistical Manual of Mental Disorders). (Tr. 88). She further testified that borderline personality disorder is one of "the more severe personality disorders because it comes with often behaviors that are really problematic, and mood symptoms as well." (Tr. 89-90). Although her testimony may suggest that Dr. Kissin's professional view is that personality disorders, as opposed to psychotic mental health illnesses, do not generally "drive an opinion of incompetence" to stand trial (Tr. 88-89), her report and her testimony make clear that she assessed Nelson to determine whether her mental health disorders rendered her unable to understand the nature and consequences of the proceedings against her and/or to assist in her own defense.

Turning first to Nelson's ability to understand the charges against her and the consequences of the criminal proceedings, Dr. Kissin's report and testimony clearly and persuasively support her opinion that Nelson is currently able to do so. Nelson accurately recounted that she faces six felony counts of sending letters containing bomb threats or threats to kill a federal judge and two members of Congress, each of whom she identified by name.[5] She understood that the charges carried possible terms of imprisonment and recalled that at least one charge carried a statutory maximum of ten years. Her descriptions of the roles of the trial

---

[5] The defense maintains that Nelson does not understand the charges because she inaccurately responded that one of the charges is that she put powder in a letter. (Docket # 50 at 12). I disagree that this inaccuracy demonstrates her lack of understanding. Nelson has been prosecuted previously for sending threatening letters and has apparently done so on numerous occasions. (Tr. 53). Apparently at least one such letter stated that it contains "amthrax" [*sic*]. (Def. Ex. 39).

participants, while somewhat rudimentary, accurately captured the different responsibilities and roles of each and the adversarial nature of the process. Moreover, her answers to Dr. Kissin's questions revealed her understanding of the differences between pleading guilty, proceeding to trial and being adjudged guilty or not guilty by a jury, and pleading not guilty by reason of insanity, as well as the consequences of each (release, imprisonment or confinement in a "prison hospital"). She exhibited her understanding that she had a right not to testify, although she had difficulty explaining the underlying concept of protection against self-incrimination. Although she did not answer every question posed to her correctly or fluidly, particularly those that asked for her to discuss abstract information or concepts (Tr. 78-79), I find well-supported Dr. Kissin's opinion that Nelson "was able to demonstrate an understanding of her charges and the possible consequences." (*See* Docket # 44 at 10).

Finally, the question of Nelson's ability to assist in her defense is, in my estimation, the central and closest question posed by this case. Indeed, as defense counsel noted in her affidavit in support of the motion for a competency hearing and in her post-hearing submission, Nelson has refused repeatedly to come to the phone to speak with counsel, refused to meet with a psychiatrist retained by defense counsel, and disconnected from a video court appearance.[6] (Docket # 50 at 3, 16 (citing Docket # 23-1 at ¶¶ 3-5)). In her report, Dr. Kissin noted that Nelson expressed "dissatisfaction with her attorney," but nonetheless conveyed her

---

[6] The docket for this case does not document Nelson's disconnection or departure from a video court appearance. Rather, the docket minute entry for her arraignment – the only court appearance before the competency hearing at which the defendant was present – reflects that she was present and participated, including consenting to appear by video and waiving her right to an immediate detention hearing. (*See* Docket Minute Entry for March 10, 2021). Although an earlier video arraignment had been scheduled, the minute entry for the scheduled appearance reflects that it was not held because Devens could not connect to the video proceeding. (*See* Docket Minute Entry for February 16, 2021).

intention to continue to work with her if the Court denied her anticipated motion for substitution of counsel.  (Docket # 44 at 10).

Defense counsel vigorously examined Dr. Kissin about her opinion that Nelson is competent to assist in her defense and that her significant interpersonal difficulties do not undermine her ability to assist.  Counsel explored in detail Dr. Kissin's conclusion that Nelson does not suffer from delusional disorder because, as Dr. Kissin acknowledged, a defendant's "capability of telling [their lawyer] truthful facts" is critical to her ability to assist in her defense. (Tr. 44; *see also* Tr. 21-48, 54-59).  As discussed *supra*, Dr. Kissin explained consistently and persuasively the reasons why she believes that Nelson currently does not suffer from delusional disorder.  In her testimony, she emphasized that Nelson's interpersonal difficulties do not result from delusional disorder, but from personality disorder "and possibly some additional contribution from intellectual limitations in that her thinking is not very sophisticated, so that can also . . . undermine sort of her ability to kind of understand the information that's being given to her."  (Tr. 69-70).

With respect to Nelson's reported behavior of refusing to come to the phone to speak with her attorney, Dr. Kissin explained that "refusing to speak with [counsel] would not have anything to do with capacity, it would be with her will at that time."  (Tr. 67-68).  She further testified:

> It would show me that she may have a disagreement, or a distress [in]tolerance, not willingness, lack of interest. . . . It would impede her mounting a defense; it would not speak to capacity.

(Tr. 68-69).  Although Nelson's interpersonal difficulties, which have included "multiple examples" in her past history of "walking away, stopping, refusing to communicate," could interfere with her "willingness and tolerance of hearing things she may not like and [ability] to

continue conversations [with counsel] in that context," those difficulties do not demonstrate her

lack of "capacity of consult," Dr. Kissin continued.  (Tr. 70-72).  In other words, that Nelson has

the capacity to consult does not mean that she "would actually do that or make decisions about

what [she] should do in [her] case."  (Tr. 74).

            In addition to "interpersonal" issues, defense counsel cites other facts in support

of her contention that Nelson does not have the ability to assist in her own defense.  (Docket # 50

at 12-13, 16-17).  She notes that Nelson's complaints about her attorney "just collect[ing] [her]

medical and mental health records and send[ing] her paperwork" demonstrates her inability to

comprehend that her medical and mental health records are "valuable evidence" and that the

paperwork "contains information about potential defense strategies."  (*Id.* at 12).  Significantly,

Dr. Kissin's report reflected that in conjunction with that particular complaint, Nelson stated that

her counsel "should be finding out more issues that this case is about."  (Docket # 44 at 9).

Thus, it appears that Nelson's complaint may have stemmed from her frustration or belief that

too much emphasis was being placed on her mental health issues rather than the non-intent

aspects of the charges.  For example, Nelson also noted that she understood that a fingerprint

analysis of the letters had been conducted, but that she had not seen the results.  (*Id.* at 10).

Moreover, Dr. Kissin's report suggested that Nelson fundamentally understood that her mental

condition is indeed relevant to the prosecution: she told Dr. Kissin she "may choose to plead [not

guilty by reason of insanity] and use her extensive mental health records to substantiate the

plea."  (*Id.* at 9).

            Counsel also challenges Dr. Kissin's contention that Nelson has the capacity to

make decisions that a defendant is required to make during a prosecution.  In particular, she cites

Nelson's difficulty and frustration discussing with Dr. Kissin how she would go about deciding

whether to accept a plea or proceed to trial.  (Docket # 50 at 13).  Dr. Kissin noted, however, that the problems appeared to stem from Nelson's difficulties discussing concepts in the abstract, and observed that "[Nelson] proceeded to speak about her case in particular" and "[a]fter several minutes of questioning, she was able to articulate that the defendant must 'understand what they're saying, the charges' and that taking a plea deal would result in a lesser sentence than if found guilty at trial."  (Docket # 44 at 9; *see also* Tr. 79, 83-84).  In summary, Dr. Kissin stated, "Nelson identified the factors she would consider when making decisions related to plea bargaining and testifying, suggesting capacity for rational decision-making."[7]  (Docket # 44 at 10).  I credit Dr. Kissin's conclusion as supported by the record.

Counsel also contends that the "evidence does not show that Ms. Nelson appreciates appropriate courtroom behavior."  (Docket # 50 at 13).  Although counsel is clearly correct that inappropriate courtroom behavior, particularly disruptive behavior that risks removal from the courtroom, may impede the defense and counsel's ability to consult with her client, I disagree that the record here demonstrates Nelson's lack of understanding of appropriate courtroom behavior or her inability to conform her behavior to those norms.  Nelson's answers to Dr. Kissin's questions on the subject during the evaluation show that she had an accurate and adequate understanding of acceptable and unacceptable behavior.  (*See* Docket # 44 at 9).  Moreover, during the more than two-hour competency hearing, Nelson had no outbursts and engaged in no disruptive conduct.  The Court noted that Nelson spent a significant amount of time with her head on the table and asked Dr. Kissin about whether that unusual conduct affected her assessment of Nelson's competence.  (Tr. 92-93).  Dr. Kissin responded that she knows that

---

[7] Dr. Kissin acknowledged that Nelson's mental health history includes examples of engaging in "thinking and behavior that are irrational."  (Tr. 52).

Nelson "has the capacity to engage because [Nelson] has done that with [Dr. Kissin] for extended periods . . . and that there are times [Nelson] decides she doesn't want to" (Tr. 93), and Dr. Kissin suggested that Nelson's behavior may reflect "poor stamina," "fatigue" and "disengagement" as a result of "significant underlying health conditions" and/or the "sedating qualities" of her medications, but acknowledged she was "just making an educated guess." (Tr. 94-95). On this record, I reject counsel's contention that Nelson does not appreciate appropriate courtroom behavior and find to the contrary.

Dr. Kissin's hearing testimony and report make clear that Nelson's cooperation, behavior and communication during the multi-session competency evaluation was a consideration upon which Dr. Kissin relied in reaching her determination that Nelson currently has the ability to assist in her own defense. (Tr. 71-73; Docket # 44 at 7-10). For example, when questioned about Nelson's low tolerance for distress, Dr. Kissin testified:

> I've engaged with her around issues about the charges and she was able to tolerate that. Although again, there might be times or specific situations that come up that can be more triggering and she can react in a more extreme way, but to date around these particular charges that is not the way that she's responded.

(Tr. 72-73). While acknowledging that Nelson's "willingness to engage" with others, including presumably counsel, "varies," Dr. Kissin observed that Nelson "sat through multi hour interviews with me and other providers most of the time." (Tr. 71).

Another factor upon which Dr. Kissin relied in reaching her conclusion was Nelson's response to her current antipsychotic medication, Geodon. As Dr. Kissin explained, that medication has been effective in reducing the frequency and severity of the behavioral problems associated with Nelson's personality disorder. (Tr. 21, 36, 89). For example, Dr. Kissin testified:

> [Nelson's] most prominent features have been more behavioral,
> and the Geodon has again by record review, by my own
> observation, and by [Nelson's] own account helped to manage
> some of those behavioral problems that she's had consistently.

(Tr. 21).  Similarly, Dr. Kissin's report observed, "[p]resent treatment with an antipsychotic

medication appears to serve as a calming agent, and has notably decreased the frequency and

severity of Ms. Nelson's behavioral and adjustment problems."  (Docket # 44 at 10).  Dr. Kissin

acknowledged that Nelson has not always been compliant with medication (Tr. 21) and "when

she's not on medication, she is much more provocative, she engages in self-harming behaviors,

she engages in a lot of oppositional behaviors" (Tr. 36).

As I previously indicated, I find Dr. Kissin to be a credible expert witness; her

experience, thorough evaluation, and clear and persuasive report and testimony lead me to accept

her conclusions as to Nelson's diagnosed mental health disorders and credit her competency

findings.  Like Dr. Kissin, I too find relevant to the issue of competency the fact that Nelson

generally participated cooperatively with Dr. Kissin during the several-month evaluation,

communicated adequately with her, and exhibited no significant behavioral problems during

their meetings.  Although Nelson cut short one meeting, she apologized at the next meeting,

explained that she was not feeling well, and was able to continue with the evaluation.  I also find

relevant and important that Nelson's current medication appears to effectively reduce the

behavioral symptoms that have in the past been a pronounced symptom of her personality

disorder and that, if not managed, can cause significant interpersonal difficulties, as they have

throughout Nelson's adult life.

Although Dr. Kissin did not discuss Nelson's prior criminal cases in detail, I also

find notable that her most recent federal charges, which were similar to the pending charges,

were resolved with a guilty plea that the Court accepted following a competency hearing and determination. *United States v. Nelson*, No. 05-CR-6169 (W.D.N.Y. Dec. 19, 2006) (Docket # 21). At the plea, she was represented by the same federal public defender who was assigned at her initial appearance, suggesting that counsel was able to forge a sufficiently functional relationship with Nelson that continued through plea and sentencing. In this case, defense counsel apparently has not succeeded to date in gaining Nelson's trust, let alone in building a productive relationship, despite Nelson's representation by counsel who is clearly experienced, intelligent, careful, and thorough. At this stage, I agree with Dr. Kissin that the issues with current counsel do not demonstrate that Nelson is not currently competent, that is, *unable* to assist in her defense. The problems thus far appear to center on communication difficulties arising from Nelson's refusal to come to the telephone to speak to counsel. *See*, *e.g.*, *United States v. Cunningham*, 556 F. Supp. 2d 968, 970-71, 976 (S.D. Iowa 2008) ("[The government's psychiatric expert] believes that the [d]efendant is capable of assisting her lawyer in her defense, through her diagnoses [major depressive disorder, dysthymic disorder and suicidal ideation] may make it more difficult at times. The [c]ourt's view of the evidence leads it to agree. . . . [A] lack of desire to help her attorney is different than an inability to do so. . . . Added difficulty for counsel in communicating with a [d]efendant due to a mental impairment of some sort does not, however, make the [d]efendant incompetent to stand trial."); *United States v. Rivera*, 1995 WL 20452, *6 (N.D. Ill. 1995) ("The defendant appears to see no benefit in cooperating with anyone involved in the proceedings, including his attorneys. This refusal to participate is not, however, equivalent to an inability to assist in the preparation of his defense. Therefore, although it may be difficult to communicate with the defendant, the court finds that the defendant's depression does not render him unable to consult with his attorneys . . . and concludes that [he] is presently

legally competent to stand trial."). The establishment of a functional attorney-client relationship may depend upon counsel meeting with Nelson in person at Devens, as Dr. Kissin did, at least initially.

Based upon a careful review of this record, I find by a preponderance of the evidence that Nelson is not presently suffering from a mental disease or defect that would render her incompetent within the meaning of 18 U.S.C. § 4241. Specifically, I find that Nelson is currently able to understand the nature and consequences of the proceedings against her and assist properly in her defense. This finding does not, of course, amount to a guarantee or even a determination that Nelson will remain competent in the future – an issue that likely will depend upon many factors including, to name a few, Nelson's continued compliance with her medication, the medication's continued effectiveness in managing her behavioral symptoms, and Nelson's ability to adjust to the stress of future criminal proceedings, especially a trial in the event that she proceeds to trial (*see* Tr. 72). Counsel may request and the Court may order further competency proceedings if reasonable cause develops to believe that Nelson is no longer competent to stand trial.

## **CONCLUSION**

For the above-stated reasons, it is the recommendation of this Court that the defendant Dennis Nelson be determined currently competent to stand trial.

*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
       August 29, 2022

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

      **ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

      **ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59 of the Federal Rules of Criminal Procedure.[8]

      The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See*, *e.g.*, *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

      <u>**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**</u> *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

      Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**


                                      *s/Marian W. Payson*
                                     MARIAN W. PAYSON
                             United States Magistrate Judge

Dated: Rochester, New York
       August 29, 2022

---

[8] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).